UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MATT WENTHOLD, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:11-CV-0748-B |
| | § | |
| CITY OF FARMERS BRANCH, TEXAS | § | |
| and TIM O'HARE, in his individual | § | |
| capacity, | § | |
| | § | |
| Defendants. | § | |

<u>MEMORANDUM OPINION AND ORDER</u>

Before the Court is the Motion to Dismiss, or in the Alternative, Motion for Summary Judgment of Defendants City of Farmers Branch, Texas ("the City") and Tim O'Hare ("O'Hare," collectively with City of Farmers Branch, "the City") filed June 17, 2011 (doc. 14). Also before the Court are the objections of Plaintiff Matt Wenthold ("Wenthold") to Defendants' Appendix (doc. 21) and the City's objections to Wenthold's Appendix (doc. 25). For the reasons stated below, Wenthold's objections are **OVERRULED**. The City's objections are **OVERRULED**. The City's motion for summary judgment is **GRANTED**. Wenthold's claims are **DISMISSED**. Wenthold's request for discovery under Federal Rule of Civil Procedure 56(d) ("Rule 56(d)") is **DENIED**.

I.

BACKGROUND

This case involves a dispute over the boundaries of free speech in the context of a city council meeting. Plaintiff, Matt Wenthold, maintains that the City of Farmers Branch violated his First Amendment rights by cutting off his remarks during a Farmers Branch City Council meeting

- 1 -

in November 2010. Former Mayor Tim O'Hare presided over meeting at issue and, along with the City of Farmers Branch, is named as a Defendant in this case *Id.* at ¶ 22. The relevant facts follow.

A.      *Library Privatization Proposal*

In mid-2010, the Farmers Branch City Council ("City Council" or "the Council") announced its intent to pursue privatization of the Manske Library ("the Library"), the only publicly owned library within Farmers Branch. *Id.* at ¶¶ 6, 12. Pursuant to this intent, the City released a Request for Proposal ("RFP") for operation and administration of the Library on September 10, 2010. *Id.* at ¶ 12. In response to the RFP, the City received proposals from the Library's current administration and also from Library Systems and Services, LLC ("LSSI"), a private company. *Id.* at ¶ 13. The City then announced that it would make its determination regarding the proposals at a City Council meeting on November 16, 2010. *Id.* at ¶ 14. Many Farmers Branch residents opposed privatization and some voiced this opposition at City Council meetings prior to the November 16, 2010 meeting. *Id.* at ¶ 15. Wenthold alleges that Defendants had made controversial decisions behind closed doors in violation of the Texas Open Meetings Act, leading opponents of Library privatization to fear that the City Council had already decided to privatize the Library. *Id.* at ¶¶ 16-18.

The posted agenda for the November 16, 2010 City Council meeting included Item E.1, "Consider adopting Resolution No. 2010-074 for proposals for Administration and Operation of the Manske Library and take appropriate action." Defs.' App. 36-37. Members of the public present at the City Council meeting on November 16, 2010 were allowed to submit comment cards that allowed them to approach the podium when called and to speak to the City Council about items on the agenda. Compl. ¶ 20; Defs.' App. 39-40. Commenters were allowed two minutes to speak. Defs.' App. 39-40 (speaker comment card); Defs.' Supp. App. 46-47 (O'Hare explains that speakers would

have two minutes each). At the meeting, twenty-four of twenty-seven people who commented on the Library initiative opposed privatization and others in attendance also held signs expressing opposition to Library privatization. *See* Defs.' Supp. App. 47-87; Defs.' App. Ex. 9 (video recording of Nov. 16, 2010 meeting). Wenthold completed and timely submitted his comment card and had a prepared statement expressing his opposition to privatization. Compl. ¶ 23; Defs.' 2d Supp. App. Exs. 14-15. His card listed the subject on which he wished to speak as "Library outsourcing" and Wenthold had checked the line indicating that he was against the proposal. Defs.' App. 40. The comment card admonished that "Citizens wishing to address Council regarding a topic not on the agenda must complete a blue form," and the topic would be reviewed and possibly scheduled for a future meeting. *Id.* The card further explained that "[c]onstructive comments are welcomed by the City Council. However, no personal or disparaging remarks directed at any individual or disruption of the meeting in any way will be permitted." *Id.* At the meeting, prior to Wenthold's comments, there was some discussion of the City's need to reduce expenses and how library privatization was one of the methods the City was exploring. *See* Defs.' Supp. App. 4-13 (O'Hare discussion of reasons for library privatization). Most commenters objected to library privatization based on concerns such as the quality of library services. *See, e.g.,* Defs.' Supp. App. 47-48 (comments of Kathleen Matsumura). However, one speaker who followed Wenthold discussed the City's "crusade against illegal immigrants" and the City's willingness to spend "millions more in legal fees to keep that fight going," which he apparently believed were "the real reasons" for privatizing the library. Defs.' Supp. App. 83-84 (comments of Jim Manning).[1]

---

[1] This same commenter also argued that the Council had "skillfully changed the city charter so that the city council now has practically absolute control" like "absolute monarchs" before being cut off by O'Hare

B.    *Wenthold's Remarks and Exchange With O'Hare*

When O'Hare called his name, Wenthold approached the podium and began to speak, expressing his view that the City's economic justifications for privatizing the Library were pretextual. Defs.' Supp. App. 66-67. Specifically, Wenthold argued that any economic difficulties the city had were "mostly self-inflicted" due to the City's mismanagement. *Id.* Based on his comments, Wenthold appeared of the opinion that the true reason for the City's move toward privatization of the Library was the budget shortfall caused by the City's expensive "pet projects" and the legal fees associated with the lawsuits filed against the City in connection with its attempts to restrict immigration through city ordinances ("the immigration ordinances"). *Id.*; *see also id.* at 71. Wenthold proceeded to state his view that O'Hare and the City Council misled the residents of Farmers Branch by stating that insurance would cover the legal fees for the immigration ordinance litigation. *Id.* at 67. At this point, O'Hare interjected, stating:

> Okay, I'm going to have to stop you here, and I'm going to cut you off, and I'm going to say I'm tired of hearing that, Matt. I have specifically told you – excuse me, I'll have everybody thrown out of here if it keeps up. I'm going to speak. Okay, I will.
> Clear the chambers. Clear the chambers. We'll reconvene when you can keep your mouth closed. I'm going to speak to this, because I'm tired of you saying the same thing over and over that I have specifically taken you to lunch and said – and set you straight.
> Hang on. We're going to clear the chamber, and we will meet back here in 5 minutes and I'm going to address that.

*Id.* at 67-68. Examination of the video recording of the meeting demonstrates that members of the audience expressed vocal displeasure at O'Hare's decision to cut off Wenthold's remarks. *See* Defs.'

---

for using up his allotted time. *Id.*

App. Ex. 9 at 1:48:44-1:48:50. At that point, the chamber was cleared and a five minute recess

ensued. Defs.'App. Ex. 9 at 1:48:51-1:53:51.

> After the recess, O'Hare began by stating:
>
> As Mayor, it's my responsibility to make sure this meeting is conducted well, and it's
> also my responsibility to make sure that this body, myself included, is treated with
> respect. If anyone else speaks out loud while someone is at that microphone, other
> than from right here, you will be escorted out of the building immediately. No
> exceptions.
> In addition, if anyone hoots or hollers another time when somebody says
> something blasting the Council, you'll be removed from the building immediately.
> This didn't have to be on the agenda to allow people to speak. As we have
> periodically done, or almost always done, we allowed public input when this is not an
> item that requires public input.

Defs.' Supp. App. 68-69. O'Hare proceeded to state his view of the projects and legal fees mentioned

by Wenthold, stating "I have sat up here for four years and listened to Mr. Wenthold say one

incorrect thing after another." *Id.* at 69-71. After O'Hare finished addressing Wenthold's criticisms,

Wenthold then asked, "May I respond?", to which O'Hare responded, "No, you may not. You have

one minute to talk about the library." *Id.* at 71. Wenthold then finished his prepared remarks in

opposition to library privatization. *Id.*; Pl.'s App. 10 ("Wenthold Decl.") ¶ 24. In all, Wenthold spoke

for approximately 1 minute and 50 seconds before the recess and another 30 seconds after the recess,

longer than the two minutes allotted to other speakers. Defs.' App. Ex. 9 at 1:46:45-1:48:35;

1:59:30-2:00:01.

C.   *The Parties' Characterization of the Exchange*

The parties dispute both the reason for the clearing of the chambers and the manner in

which the chamber was cleared. Wenthold characterizes the clearing of the chambers as part of a

series of actions by O'Hare "mak[ing] it abundantly clear that Wenthold would not be permitted to

express his viewpoint at the meeting." Pl.'s Resp. 15-16. With respect to the manner in which the

chambers were cleared, Wenthold states:

> At O'Hare's instruction, several police officers entered the audience in order to clear
> the chamber. Also at O'Hare's command, a police officer approached me in order to
> escort me from the chamber individually. As the officer approached, he positioned
> himself only inches from my body, invading my personal space. Although the police
> had helped clear the room *en masse*, I was the only person in the chamber to be
> individually escorted from the chamber by a police officer at or near my side. The
> message was clear to me: speaking out against the City or O'Hare would not be
> tolerated.

Wenthold Decl. ¶ 20.

The City counters that the audience "interrupted the meeting by disruptively shouting out,

thus further causing the need for a recess before the meeting got more out of hand," and that

"[k]eeping speakers at the designated podium focused on the agenda topic and keeping the crowd

from disruptively shouting out from their seats are necessary content/manner restrictions on speech

at Council meetings." Defs.' Mot. Br. 18 (citation omitted). The City further contends that "Plaintiff

was not arrested, cited and/or escorted from the Council Meeting." Defs.' Mot. Br. 5. Although the

video record of the meeting shows police officers appearing in the chambers, it does not otherwise

confirm Wenthold's characterization of the clearing of the chambers. *See* Defs.' App. Ex. 9 at

1:48:50-1:55:05. However, the Court draws no inference from the on-camera occurrences as to what

may have taken place off camera or after the video feed switched to a graphic stating that the

Council was in recess. *Id.* at 1:48:50-1:53:51.

Wenthold claims that O'Hare's intimidation[2] and threats prevented him from "completing [his] criticisms concerning the alleged justifications for privatizing the Library." Wenthold Decl. ¶¶ 24-25. However, he has not specified what additional criticisms he would have made if not for O'Hare's actions, other than perhaps responding to O'Hare's statements. Examination of one draft version of Wenthold's prepared text indicates that Wenthold gave all of his prepared remarks with the exception of one sentence, which he would have read after his remarks prior to the recess and before the remainder of his remarks after the recess. *Compare* Defs.' 2d Supp. App. Ex. 15 at 1-2 (email to Wenthold from Bob Manna with script for prepared remarks) *with* Defs.' Supp. App. 66-67, 71 (transcript of remarks at City Council meeting) (with exception of minor wording changes, only difference in draft prepared remarks and remarks as given at City Council meeting is addition of sentence "Now we are out three and a half million dollars and that number is growing with each loss in federal court.").

On April 13, 2011, Wenthold filed suit against the City and O'Hare, asserting that they violated 42 U.S.C. § 1983 by restricting his speech. In response to Wenthold's complaint, the City filed its Motion to Dismiss, or in the Alternative, Motion for Summary Judgment. The motion is now ripe for disposition.

---

[2]Although Wenthold and Farmers Branch agree on the actual words spoken at the meeting, they diverge considerably as to the tone of O'Hare's remarks. Wenthold, for example, states that O'Hare "aggressively" pointed at him multiple times and "aggressively attacked" his comments. Wenthold Decl. ¶¶ 18, 22.

## II.

## LEGAL STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when the pleadings and record evidence show that no genuine issue of material fact exists and that, as a matter of law, the movant is entitled to judgment. *Hart v. Hairston*, 343 F.3d 762, 764 (5th Cir. 2003). In a motion for summary judgment,[3] the burden is on the movant to prove that no genuine issue of material fact exists. *Provident Life & Accident Ins. Co. v. Goel*, 274 F.3d 984, 991 (5th Cir. 2001). To determine whether a genuine issue exists for trial, the court must view all of the evidence in the light most favorable to the non-movant, and the evidence must be sufficient such that a reasonable jury could return a verdict for the non-movant. *See Chaplin v. NationsCredit Corp.*, 307 F.3d 368, 371-72 (5th Cir. 2002).

When the party with the burden of proof is the movant, it must establish each element of its claim as a matter of law. *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). If the non-movant bears the burden of proof at trial, the summary judgment movant need not support its motion with evidence negating the non-movant's case. *Latimer v. SmithKline & French Labs.*, 919 F.2d 301, 303 (5th Cir. 1990). Rather, the movant may satisfy its burden by pointing to the absence

---

[3]The City filed its motion as a "Motion to Dismiss, or in the Alternative, Motion for Summary Judgment," and attached a substantial amount of evidence in support as appendices. A court may refer to the public record when deciding a Rule 12(b)(6) motion to dismiss without converting the motion into one for summary judgment. *See, e.g., David v. Bayless*, 70 F.3d 367, 372 n.3 (5th Cir. 1995). A court may also consider documents attached to a motion to dismiss without converting the motion into a motion for summary judgment if the attached documents are central to the Plaintiff's claim and the authenticity of the document is not challenged. *See, e.g., Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002). However, given the fact-specific nature of Wenthold's case and the City's apparent recognition that its arguments may be more appropriate on summary judgment, the Court treats the City's motion as a motion for summary judgment.

of evidence to support the non-movant's case. *Id.; Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

Once the movant has met its burden, the burden shifts to the non-movant, who must show that summary judgment is not appropriate. *Little*, 37 F.3d at 1075 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). "This burden is not satisfied with 'some metaphysical doubt as to material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Id.* (citations omitted). A non-moving party with the burden of proof must "identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim," *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004), and "come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis in original) (quoting FED R. CIV. P. 56(e)).

## III.

## EVIDENTIARY OBJECTIONS

A.   *Wenthold's Evidentiary Objections*

Wenthold objects to certain exhibits submitted by the City in support of its motion, arguing that they are not properly before the Court as business records based on a "Business Records Affidavit" of Cindee Peters, the City Secretary. Specifically, Wenthold argues that Ms. Peters' affidavit "does not state, much less establish, that the exhibits were 'made by the regularly conducted activity as a regular practice,'" and the exhibits submitted as business records are not in fact business records. Pl.'s Obj. 2. The Court **OVERRULES** these objections for the reasons listed below.

i.      The City's Peters Affidavit

As explained by the City, Ms. Peters' affidavit states that the records were made "during the regular course of business," which the Court finds meets Federal Rule of Evidence 803(6)(A) and 902(11)'s requirement that a declaration from a custodian show that each record "was kept in the course of a regularly conduced activity" and "as a regular practice." Further, the City has filed a revised affidavit incorporating the actual language from Rule 803(6)(A). *See* Defs.' Supp. App. i-ii (Revised Peters Affidavit). Accordingly, Wenthold's objection to the original Peters affidavit is **OVERRULED**.

ii.     The City's Exhibits 3-6

Wenthold objects to the City's Exhibits 3-6 as "documents prepared to advise the City Council of information either in response to a request or at the direction of the City's administration" and therefore "do not constitute records of an activity – such recording the number of visitors to the library or books checked out – but instead constitute individualized reports," and are therefore not business records. Pl.'s Obj. 3. The Court disagrees that "individualized" reports may not be business records under Rule 803. The Peters Affidavit states that these records, annual reports of the library and a report regarding library privatization, are public records made during the regular course of business. The City further explains that these types of reports are regularly generated for the City Council for discussion or consideration.[4] Defs.' Resp. Pl.'s Obj. 3. Further, Wenthold has produced no evidence calling into question the reliability or authenticity of these records. *See, e.g., Gilbrook v. City of Westminster*, 177 F.3d 839, 858 (9th Cir. 1999) (amended on

---

[4]Alternatively, these exhibits are admissible under Federal Rule of Evidence 803(8) as public records.

other grounds) (public records are presumed authentic and trustworthy, and burden of establishing otherwise falls on the opponent of the evidence). Accordingly, Wenthold's objections to Exhibits 3-6 are **OVERRULED**.

iii.    The City's Exhibit 7

Wenthold objects to the speaker "sign-up" card completed by him at the November 16, 2010 City Council meeting. The Court finds that Wenthold's completed speaker sign-up card is an admissible business record as established by the Peters Affidavit.[5] City employees regularly provide speaker comment cards at City Council meetings, these cards are completed by members of the public, and the cards are made and kept as part of the City's official public records. Further, Wenthold appears to admit that he did, in fact, fill out the comment card at issue. *See* Pl.'s Obj. 3. Accordingly, Wenthold's objection to Exhibit 7 is **OVERRULED**.

iv.    The City's Exhibit 10

Wenthold objects to Defendants' Exhibit 10, minutes of the City Council meeting on November 16, 2010, as unsigned and therefore "not certified or authenticated." Pl.'s Obj. 3. However, Rule 803 does not require business records to be signed – they need only be made near or at the time of the occurrence of the matter set forth therein or from information transmitted by a person with knowledge of those matters, kept in the course of the regularly conducted activity, and made by the regularly conducted activity as a regular activity. The City Secretary creates minutes of the Council meetings during and after each meeting as a regular practice. Further, the City has since provided signed minutes. *See* Defs.' Supp. App. 149-154. Accordingly, Wenthold's objection

---

[5]Alternatively, this exhibit is admissible under Federal Rule of Evidence 803(8) as a public record.

to Exhibit 10 is **OVERRULED** as moot. The Court will refer to the signed minutes as contained in the City's Supplemental Appendix.

B.      *The City's Evidentiary Objections*

The City objects to Wenthold's declaration as "nothing more than a copy and paste job of the unsupported averments contained in Plaintiff's Original Complaint." Defs.' Obj. 2. The City specifically cites various paragraphs of Wenthold's declaration as hearsay, "conclusory allegations/impermissible conclusions," "unsubstantiated assertions," "self-serving statements," or "subjective beliefs." *Id.* at 3. In the City's view, the Wenthold declaration's conclusory allegations and unsubstantiated assertions are insufficient to withstand a motion for summary judgment, in light of the City's evidence. The Court **OVERRULES** these objections. The City's arguments essentially address whether 1) assuming the City has made its prima facie case, Wenthold has met his burden of showing that a genuine issue of material fact exists as to the City's liability, or 2) the weight that should be given to Wenthold's testimony at trial, as opposed to whether the testimony is admissible at trial. The Court finds that the Wenthold Declaration is admissible under Federal Rule of Civil Procedure 56(e) as its assertions are based on personal knowledge and reasonably inferred from the "nature of [his] participation in the matters to which [he] swore." *DIRECTV Inc. v. Budden*, 420 F.3d 521, 529-30 (5th Cir. 2005) (citation omitted); *see also United States v. Cantu*, 167 F.3d 198, 204 (5th Cir. 1999) ("Personal knowledge can include inferences and opinions, so long as they are grounded in personal observation and experience.") (citation omitted).

The City also objects to the declaration of Wenthold's attorney, Mr. Dunham Biles, as "nothing more than a recitation of legal arguments, which is appropriate for a motion or a brief, but not appropriate summary judgment evidence." Defs.' Obj. 2. The Court **OVERRULES** this

objection. The Biles Declaration was not submitted as summary judgment evidence but rather as evidence in support of Wenthold's request for further discovery under Rule 56(d). The Court will address Wenthold's request for further discovery later in this order.

## IV.

## ANALYSIS

A.    *The City's Motion for Summary Judgment*

Although the City presents several arguments in support of its motion for summary judgment, the centerpiece of its motion is that O'Hare acted not to curtail Wenthold's viewpoint but to keep him on topic and to prevent audience members from disrupting the City Council meeting. The City argues that its rules allowing members of the public to address the City Council for two minutes from a podium on agenda items "are precisely the type of content-neutral, reasonable, time, place, and manner restrictions permitted" by the Supreme Court and other courts. Mot. Br. 15. In its view, "[k]eeping speakers at the designated podium focused on the agenda topic and keeping the crowd from disruptively shouting out from their seats are necessary place and manner restrictions on speech at Council meetings," the City has a right to prevent a disruption, and the five-minute recess called by O'Hare "was necessary to settle the disruption before it worsened." *Id.* (citing *Luckett v. City of Grand Prairie*, 2001 WL 285280 (N.D. Tex. Mar. 19, 2001)). The City also offers that Wenthold was allowed to speak for longer than the two minutes normally allowed under Council rules. *Id.* at 16.

Wenthold counters that the City engaged in unconstitutional viewpoint discrimination by cutting off his remarks, preventing him from expressing his viewpoint "that the City's purported justification for privatizing the Library (the downturn in the City's economy) was misleading to the public and, if not for the City's gross financial mismanagement, privatization of the Library would

not have even needed to be considered." Pl.'s Resp. 15 (citing Compl. ¶¶ 24, 44; Wenthold Decl. ¶ 17; Defs.' App. Ex. 9 at 1:46:38-1:48:23). According to Wenthold, O'Hare's actions in interrupting his prepared remarks, clearing the chambers, having a police officer escort Wenthold from chambers, threatening to remove anyone speaking out, and not allowing Wenthold to address O'Hare's comments were all part of the City's policy of silencing criticism of the City Council, as opposed to content-neutral time, place, and manner restrictions.

     i.     Type of Forum

In order to decide whether Wenthold's constitutional rights were violated, the Court must first determine the appropriate forum analysis to apply to the Farmers Branch City Council meeting at issue. Supreme Court precedent has delineated three types of "public" forums applying to government property: traditional public forums, designated public forums, and limited public forums. *Christian Legal Soc'y Ch. of the Univ. of Cal., Hastings C. of the L. v. Martinez*, 130 S.Ct. 2971, 2984 n.11 (2010) (citing *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 469 (2009)). Traditional public forums include public streets and parks "'which have immemorially been held in trust for the use of the public and, time out of mind, have been used for the purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *Pleasant Grove City*, 555 U.S. at 469 (quoting *Perry Ed. Assn. v. Perry Loc. Educators' Assn.*, 460 U.S. 37, 45 (1983) (other citation omitted). In contrast, designated public forums are created by governmental entities when "government property that has not traditionally been regarded as a public forum is intentionally opened up for that purpose." *Christian Legal Soc'y*, 130 S.Ct. at 2984 n.11. With both traditional public forums and designated public forums, governmental restrictions on the content of speech in traditional public forums must satisfy a strict scrutiny analysis, *i.e.*, "the restriction must be narrowly

tailored to serve a compelling government interest." *Id.* The Supreme Court has also explained that under the strict scrutiny test, a governmental body may enact limits on the time, place, and manner of speech so long as the restrictions are content neutral, narrowly tailored to serve a significant government interest, and leave open ample alternatives for communication. *See, e.g., Burson v. Freeman*, 504 U.S. 191, 197 (1992).

Limited public forums are created by governmental entities when they open property "limited to use by certain groups or dedicated solely to the discussion of certain subjects." *Christian Legal Soc'y*, 130 S.Ct. at 2984 n.11. *Id.* Restrictions on speech in a limited public forum are subject to a lower level of scrutiny than those in a traditional or designated public forum.[6] *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106-07 (2001)). In limited public forums, "a government entity may impose restrictions on speech that are reasonable and viewpoint-neutral." *Christian Legal Soc'y*, 130 S.Ct. at 2984 n.11; *see also Chiu v. Plano Indep. Sch. D.*, 260 F.3d 330, 346 (5th Cir. 2001) ("When a public body establishes a limited public forum of this sort, that body may restrict the expression that takes place within the forum so long as the restriction (1) does 'not discriminate against speech on the basis of viewpoint' and (2) is 'reasonable in light of the purpose served by the forum.'") (quoting *Good News Club,* 533 U.S. at 106-07). In limited public forums, a government entity "is justified in limiting its meeting to discussion of specified agenda items and in imposing reasonable restrictions to preserve the civility and decorum necessary to further the forum's purpose of

---

[6]Accordingly, a restriction on speech in a traditional or designated public forum permitted under the strict scrutiny test would also be permissible under the lesser standard applied to limited public forums.

conducting public business."[7] *Steinburg v. Chesterfield County Plan. Comm'n*, 527 F.3d 377, 385 (4th Cir. 2008).

Here, the facts support a finding that the City created a limited public forum when it provided for a public comment period regarding library privatization at its November 16, 2010 City Council meeting. In so determining, the Court recognizes that some courts, including the Supreme Court, have found in the past that public comment periods during city council or similar meetings may be considered designated public forums, and speech restrictions in these forums are subject to strict scrutiny. *See, e.g., City of Madison Joint Sch. D. v. Wis. Empl. Rel. Comm'n*, 429 U.S. 167, 174-75 (1976). However, more recent cases such as *Christian Legal Society* have provided clarification on this evolving doctrine[8] and convince the Court that the public comment period of the City Council meeting at issue is a limited public forum. *See* 130 S.Ct. at 2984 n.11. Further, several courts have found that similar public comment periods were limited public forums. *See, e.g., Galena v. Leone*, 638 F.3d 186, 198-99 (3d Cir. 2011) (county council meeting was limited public forum); *Steinberg*, 527 F.3d at 385 (county planning commission meeting was limited public forum); *Eichenlaub v. Twp. of Ind.*, 385 F.3d 274, 280-81 (3d Cir. 2004) (township board of supervisors meeting was limited public forum); *Rowe v. City of Cocoa, Fla.*, 358 F.3d 800, 802 (11th Cir. 2004) (city commission meeting was limited public forum); *Smith v. City of Middletown*, 2011 WL 3859738, *4 (D. Conn. Sept. 1, 2011) (city "Common Council" meeting was limited public forum); *but see Surita v. Hyde*, 665 F.3d

---

[7] Courts examining public comment periods during city government meetings under the designated public forum framework have also routinely approved time limits, restrictions on the subject matter, and actions by the government body to prevent or address disruptions. *See, e.g., Jones v. Heyman*, 888 F.2d 1328, 1332, 1334 (11th Cir. 1989).

[8] *See, e.g., Chiu*, 260 F.3d at 346 (discussing development of limited public forum doctrine).

860, 869 (7th Cir. 2011) (describing city council meeting as designated public forum). In any event, regardless of whether the City Council meeting's public comment period is a designated public forum or limited public forum, the City may not impose restrictions on speech based on the speaker's viewpoint. A review of the numerous cases in this evolving doctrine suggests that in the end, the determination of whether any restrictions on speech were viewpoint-based turns upon the facts of each case. *See, e.g.*, *Content and Viewpoint Discrimination: Malleable Terms Beget Malleable Doctrine*, 13 Comm. L. & Pol'y 131, 180 (2008) (examining First Amendment case law and recommending "[a] more fruitful approach distinguishing content from viewpoint [which] examines the case facts in context").

> ii.      The City's General Restrictions on Public Comment

Having determined that the City Council meeting was a limited public forum, the Court must determine whether any restrictions of Wenthold's speech were lawful. Courts discussing public comment periods at government meetings have routinely found that the governing body may restrict speakers to the subject at hand, impose time limits on speakers, and prevent disruptions of the meeting. *See, e.g.*, *Steinburg*, 527 F.3d at 384-86; *Kindt v. Santa Monica Rent Control Bd.*, 67 F.3d 266, 270-71 (9th Cir. 1995); *Jones*, 888 F.2d at 1332-1334. A brief discussion of the *Kindt* case is instructive. There, the Ninth Circuit explained:

> [I]n dealing with agenda items, the Council does not violate the first amendment when it restricts public speakers to the subject at hand. While a speaker may not be stopped from speaking because the moderator disagrees with the viewpoint he is expressing, it certainly may stop him if his speech becomes irrelevant or repetitious.

67 F.3d at 270 (quoting *White v. City of Norwalk*, 900 F.2d 1421, 1425 (9th Cir. 1990)). The *Kindt* court continued its analysis of *Norwalk*, explaining the Court's findings that "disruptions could be

prevented and that a speaker may disrupt a board meeting 'by speaking too long, by being unduly repetitious, or by extended discussions of irrelevancies.'" *Id.* at 270-71 (citing *Norwalk*, 900 F.2d at 1426). The *Kindt* court then went on to find that board regulations restricting public commentary to three minutes per item at the end of each meeting "are the kind of reasonable time, place, and manner restrictions that preserve a board's legitimate interest in conducting efficient, orderly meetings." *Id.* at 271 (citations omitted). The *Kindt* court also noted that the plaintiff "was not entitled to an 'equal time' response period to rebut the views" of other speakers and explained that ejection of disruptive citizens from city council meeting under decorum regulations is proper, noting the "great deal of discretion" that must be left to the governing entity. *Id.* at 271-72. For the same reasons, O'Hare and the City Council were allowed to limit speakers to two minutes, require speakers to speak only on agenda items, and call for a recess to calm a disruptive crowd, regardless of whether the Council meeting was a designated or limited public forum.

      iii.    <u>Restrictions as Applied at the November 16, 2010 City Council Meeting</u>

Having found that the City's general restrictions on speech at its City Council meetings were constitutionally permissible, the Court must determine whether they were lawful as applied at the November 16, 2010 City Council meeting. Specifically, the Court must determine whether the City's restrictions were merely a pretext for O'Hare to prevent Wenthold from expressing a viewpoint with which he disagreed. Wenthold does not argue that his speech was unlawfully restricted by certain of the City's restrictions. Specifically, he does not challenge the City's two-minute restriction on speakers, the requirement that the speaker stand at the podium, or the requirement that the speaker address the subject matter of the Resolution. Mot. Resp. 14. However, he argues that O'Hare restricted his right to address the City Council based on his viewpoint, "that the City's purported

justification for privatizing the Library (the downtown in the City's economy) was misleading to the public, and if not for the City's gross financial mismanagement, privatization of the Library would not have even needed to be considered." *Id.* at 15 (citing Complaint ¶¶ 24, 44; Wenthold Decl. ¶ 17; Defs.' App. Ex. 9 at 1:46:38-1:48:23). O'Hare allegedly restricted Wenthold's speech based on its viewpoint by interrupting Wenthold's allotted time, ordering him to stop speaking, pointing aggressively at Wenthold while berating him, threatening to throw everyone out of the chamber, clearing the chamber, ordering a police officer to escort Wenthold from the chamber, not allowing Wenthold to complete his remarks regarding the circumstances that led to the need for the proposed library privatization, threatening to forcibly remove anyone from chambers if they voiced approval when someone criticized the Council, and telling Wenthold that he could not respond to O'Hare's remarks. *Id.* at 15-16 (and citations cited therein). Wenthold also argues that O'Hare restricted his speech based on its content, for similar reasons. *Id.* at 17-18.

Based on the parties' summary judgment evidence, the Court finds that Wenthold has not raised a genuine dispute of material fact as to whether his speech was unlawfully restricted by O'Hare. Wenthold concedes that the City may impose time and subject restrictions on speakers at the City Council meeting. He also does not dispute the fact that he spoke for longer than the two minutes allotted to other participants in the public comment period, and the evidence shows that he was allowed to read all or almost all of his prepared remarks. The evidence also shows that Wenthold's comments had strayed from his general opposition to, and the merits of, the library privatization proposal to general criticisms of the City Council when he was interrupted by O'Hare. Further, the evidence shows that the audience spoke out when O'Hare interrupted Wenthold and

continued to speak out when Wenthold threatened to clear the chambers in response to further disruption from the audience.

Given these undisputed facts, Wenthold seems to be claiming an entitlement to speak without interruption despite straying off-topic as well as a right to rebut O'Hare's comments. However, and as addressed above, government bodies are permitted to restrict speakers to agenda items when allowing public comment. O'Hare allowed Wenthold to speak even though he had apparently criticized the City Council in the past either privately or publicly, he allowed Wenthold to stay at the Council meeting (albeit after clearing the chambers for a recess), and he also allowed Wenthold to finish his remarks after the recess, albeit after O'Hare had responded to Wenthold's criticisms and after informing Wenthold that he would only be allowed to "talk about the library." Although, after stopping him, O'Hare did engage Wenthold's off-topic criticisms of the Council, the Court finds that O'Hare's rejoinder – considered in the context of the undisputed record of the Council meeting – fails to raise an inference that O'Hare's actions were unconstitutionally viewpoint-directed. Moreover, the Court has found no authority that a public official's response to a speaker's off-topic remarks necessarily opens the First Amendment floor to discussion of that topic. *See Kindt*, 67 F.3d at 270-71 (speakers at public comment period are not entitled to an equal time response period to rebut the views of other speakers).

Overall, the undisputed record shows that Wenthold was permitted to speak on the library privatization proposal, he did so for longer than any other member of the general public, and he was only interrupted when he departed from the agenda topic and when the audience became disruptive. Accordingly, Wenthold has not raised a genuine issue of material fact as to whether his speech was

unlawfully restricted by the City or O'Hare, and the City's motion for summary judgment is **GRANTED**. Wenthold's claims against the City and O'Hare are hereby **DISMISSED**.[9]

B.      *Wenthold's Request for Discovery under Rule 56(d)*

Under Rule 56(d), a party may request a denial or continuance of a motion for summary judgment if it shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition to the motion. Rule 56(d) motions are "broadly favored and should be liberally granted" so that summary judgment is not prematurely granted. *Culwell v. City of Fort Worth*, 468 F.3d 868, 871 (5th Cir. 2006); *Union City Barge Line v. Union Carbide Corp., Inc.*, 823 F.2d 129, 136 (5th Cir. 1987) (both discussing prior version of Rule 56(d)). Wenthold states in his response[10] to the City's motion for summary judgment that he needs discovery regarding 1) the duties of the Mayor of Farmers Branch, in order to determine who the final policymaker is for municipal liability under Section 1983; 2) the City's assertion that the restriction of Wenthold's speech was content-neutral and narrowly tailored; 3) the mayor's understanding of whether his actions were "reasonable" for the purpose of determining whether qualified immunity applies; and 4) the City's alleged compelling interest in "undisrupted management" of the City Council meeting. Pl.'s Resp. 36-40; Pl.'s App. Ex A (Biles Decl.). However, given the Court's findings that Wenthold has failed to raised a genuine dispute of material fact as to whether his speech was unlawfully restricted, the issues of the final policymaker and qualified immunity are moot and discovery on

_____

[9]In light of this finding, the Court does not address the parties' arguments on whether O'Hare was acting within the scope of his duties as mayor of Farmers Branch and pursuant to the policies and practices of the City, nor does it address the parties' arguments regarding O'Hare's qualified immunity defense.

[10]Wenthold did not formally move for discovery under Rule 56(d) but requested discovery under Rule 56(d) in his response to the City's motion for summary judgment. Pl.'s Resp. 36-40.

these issues is unnecessary. Further, based on the summary judgment record and also existing caselaw, the Court has already found that Wenthold has not raised a genuine issue of material fact as to whether his speech was impermissibly restricted. In light of the Court's previous findings, the Court finds that additional discovery would not aid Wenthold in withstanding summary judgment and **DENIES** his request for additional discovery under Rule 56(d).

IV.

CONCLUSION

For the reasons stated above, Wenthold's objections are **OVERRULED**. The City's objections are **OVERRULED**. The City's motion for summary judgment is **GRANTED**, and Wenthold's Complaint is **DISMISSED**. Wenthold's request for discovery under Rule 56(d) is **DENIED**.

SO ORDERED.

Dated: February 14, 2012.

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE